UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCHÜTTE MSA, LLC,

        Plaintiff,

v.

CARL JAMES TRUNK and FLEXCHEM
CORPORATION,

        Defendants.
_____/

CASE NO. 2:14-cv-13317

HON. MARIANNE O. BATTANI

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Plaintiff Schütte MSA, LLC's Motion for Summary Judgment in favor of its Complaint and dismissal of the Counterclaim filed by Defendant Carl James Trunk ("Trunk"). (Doc. 22). The claims arise out of Trunk's employment as Schütte's Chief Executive Officer ("CEO"). For the reasons discussed below, the Court **GRANTS** summary judgment on Counts I (Breach of Fiduciary Duty), III (Conversion against Trunk), and IV (Conversion Against FlexChem Corporation), V (Breach of Contract), and partial summary judgment on Count II (Fraud). Finally, the Court **DENIES summary judgment on** Count VI (Claims and Delivery) and Trunk's counterclaim regarding the unpaid commissions. Finally, the Court **DISMISSES** Trunk's Counterclaim regarding the Michigan Sales Representatives Commission Act.

**I. INTRODUCTION**

Plaintiff Schütte MSA, LLC ("Schütte") is a limited liability company located in Jackson, Michigan. (Doc. 22, Ex. B at 8). Schütte sells metalworking machines throughout North America. (Id.) In 2001, Schütte hired Trunk, to sell machinery. (Doc.

22, Ex. B at 6). In 2006, Schütte promoted Trunk to President and CEO, where he served until he resigned in September 2013. (Doc. 22, Ex. B at 8, Ex. D at 25).

Defendant FlexChem is an Ohio-based S corporation. (Doc. 22, Ex. B at 32) Since 1996, Trunk has been FlexChem's sole shareholder and employee, and he concedes that he is interchangeable with FlexChem. (Doc. 22, Ex. B at 39, 44). FlexChem operated as a middle-man between Schütte and an independent vendor, Ebbco. Judith Speed, Schütte's Secretary, Controller, and current CEO, affirmed that Schütte transacted $475,155.90 of business with FlexChem during Trunk's tenure as President and CEO. (Doc. 22, Ex. A.). FlexChem only does business with "a handful of customers" other than Schütte, and FlexChem lacks dedicated office space; orders are shipped directly from the lab to the consumer. (Doc. 22, Ex. B at 51). After Trunk stopped working for Schütte, FlexChem's sales dropped to $2,900. (Doc. 22, Ex. B at 51).

According to Schütte, while Trunk was CEO, (a) he breached his fiduciary duties to Schütte by self-dealing and over-charging Schütte for purchases from a company called Ebbco; (b) Trunk and FlexChem fraudulently converted Schütte's money and property to their own use; (c) Trunk breached an agreement to repay an $80,000 loan from Schütte; and (d) Trunk shipped a piece of Schütte's machinery to an automobile restoration company and did not pay for the machine or return it to Schütte. (Doc. 22 at 6). In his Counterclaim, Trunk alleges that Schütte has failed to pay him at least $85,850 in commissions.

In 2011, United Training Munitions ("UTM") purchased four Schütte AG-20 machines with "Knoll" brand coolant and filtration systems. (Doc 26, Ex. A at 2, ¶ 13).

2

UTM later wanted to purchase an additional twelve machines, but without the Knoll brand cooling and filtration system. (Doc. 26, Ex. A at 3, ¶ 14). Because Schütte did not have a coolant and filtration system other than the Knoll, (id. at ¶ 16), Trunk contacted Ebbco Incorporated ("Ebbco") about a similar system it sold. (Id.). Ebbco's system was more expensive than Knoll's, so Trunk bought a partial Ebbco system and "coordinated with another entity" to combine the partial Ebbco system with another brand cooling and chilling system. (Id. at 17). The combination created a full system for less cost than either the full Ebbco system or the original Knoll system. (Id.). According to Trunk, FlexChem designed a cheaper cooling system to replace the Knoll system, helping Schütte secure repeat business from UTM. (Doc. 26 at 8).

In addition, UTM wanted a two-year warranty on all the component parts in the machines. Schütte only offered a one-year warranty on the parts it made and it would not warranty non-Schütte components. (Id. at ¶¶ 14-15). FlexChem aided Schütte by providing the 2 year warranty on the AG-20 machines that UTM required to purchase the machines. (Id. at 9). Trunk testified that he was not clear about how much FlexChem added to Ebbco's products, but he "guess[ed]" relative to the four Ebbco machines that it was "somewhere around 14 to 15 percent." (Id. at 89).

The parties agree that when Schütte ordered machinery or equipment from FlexChem, FlexChem acquired the items from and then sold them to Schütte. (Doc. 22, Trunk Dep. Ex. B at 41). Further, it is undisputed that Schütte could have purchased the items directly from Ebbco.

3

## II. STANDARD OF REVIEW

Summary judgment is proper where the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). During summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). Determining whether there is a "genuine" dispute "requires a fact-intensive, case-by-case analysis" that includes "looking to case law for guidance and addressing *all* the facts in the record – including those that uniformly cut against the [nonmoving party]." E.E.O.C. v. Ford Motor Co., 782 F.3d 753, 761 (6th Cir. 2015) (emphasis in original).

To successfully oppose a properly supported motion for summary judgment, the nonmoving party "must present affirmative evidence," Anderson, 477 U.S. at 257, and "do more than simply show that there is some metaphysical doubt as to the material facts." Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586-87). Ultimately, the court must decide "whether the evidence presents a sufficient disagreement to require submission to a trier of fact or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)).

## III. ANALYSIS

### A. Breach of Fiduciary Duty (Count I)

The parties disagree as to whether Trunk violated his fiduciary duty to Schütte by diverting money from Schütte. As President and CEO, Trunk owed a fiduciary duty of loyalty to act in Schütte's best interests at all times.

"As part of their fiduciary role, directors and officers must remain loyal to the corporation, acting at all times in the best interests of the corporation and its shareholders, whose interests must take precedence over any self-interest of the director, officer, or controlling shareholder that is not shared by the stockholders generally." 18B Am. Jur. 2d, *Corporations* §1480 (2015). Under Michigan law, fiduciary duties are not violated merely because a director or officer has a personal interest in a transaction. A corporation is not entitled to damages or other remedies if the interested party establishes that the transaction "was fair to the corporation at the time entered into" or that the material facts and the officer's interest were disclosed to the board or director. Mich. Comp. Laws § 450.1545a(1)(a), (b).

There is no dispute that all of Schütte's payments to FlexChem occurred while Trunk was Schütte's President and CEO. Trunk claims that his employer knew about Trunk's ownership of FlexChem, thus, no violation occurred. As support for his position that his involvement with FlexChem was "out in the open," Trunk notes that FlexChem's mail came to Schütte's office in Jackson, and Denise Miller, a Schütte employee, paid FlexChem's bills and completed its paperwork. (Id.).

In contrast to the inference Trunk wants the Court to draw, Carl Martin Welcker, the head of Alfred H. Schütte GmbH & Co., the parent company of Schütte, stated that

5

although he knew that Schütte was doing business with FlexChem, he had no idea that Truck owned FlexChem. (Doc. 22, Ex. D at 24). Although Trunk conceded that he "doesn't know" whether he ever told Welcker that he owned FlexChem, (Doc. 22, Ex. B at 50), in his affidavit, Trunk contends Welcker was aware of his involvement with FlexChem. (Doc. No. 26, Ex. 2 at ¶ 19).

As the Sixth Circuit has clearly stated, however, an affidavit cannot create a genuine dispute merely by contradicting prior deposition testimony: If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact. Reid v. Sears, Roebuck and Co., 790 F.2d 453, 460 (6th Cir. 1986) (quoting Perma Research & development Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)); see also Gagne v. Northwestern Nat. Ins. Co., 881 F.2d 309, 315 (6th Cir. 1989) ("It is accepted precedent that a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony."). Consequently, Welcker's testimony is undisputed, and Trunk has not met his burden under the statute to show his ownership was known to Plaintiff.

The parties also disagree as to whether Trunk, on behalf of FlexChem, provided "design services" or the "warranty" justifying a mark-up charged to Schütte or whether the price increase was a gratuitous "mark-up" that cost Schütte $95,001.99. (Doc. 22 at 7). Although the parties disagree as to the material facts, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

6

purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007) (finding plaintiffs' testimony a "visible fiction" where it was blatantly contradicted by a videotape).

Here, the record as a whole demonstrates that summary judgment must be granted. The evidence supports Schütte's version of events to the extent that it is sufficiently "one-sided," enough to render Trunk's claims "blatantly contradicted." Anderson, 477 U.S. at 251-52. Specifically, the parties agree that Trunk owned FlexChem at the same time that he was President and CEO of Schütte. (Doc. 22 at 16; Doc. 26 at 4). The parties also agree that Schütte did business with FlexChem during this time, inherently violating Trunk's duty of loyalty to Schütte because he voluntarily placed himself in a conflict of interest. The Court further rejects Trunk's assertion that FlexChem's mark-up was fair because it reflected the costs of transfer, warranty, and design work because the evidence shows it is essentially a fiction. (Doc. 22, Ex. B at 68). Further, although Trunk claims that he designed "plenty" of things for Schütte while he was working there, including the cobbled-together filtration system for the UTM deal, it is undisputed that neither FlexChem, which had no employees, nor Trunk, billed Schütte separately for this design work. (Doc. 22, Ex. B at 69). FlexChem never paid to ship any of the machines or machine parts from Ebbco to Schütte. (Doc. 22, Ex. B at 66-7). By Trunk's own admission,"[t]he only thing that FlexChem – the only thing brought from Ohio to Michigan . . . is drawings, assembly drawings, and design work, and any technical data." Finally, despite the testimony that FlexChem offered the extended warranty, both times that Trunk serviced the machines under warranty he charged Schütte, not FlexChem, for the travel. (Doc. 22, Ex. B at 68). Because the

evidence overwhelmingly demonstrates that FlexChem's mark-up did not reflect shipping, warranty, or design costs, Plaintiff is entitled to summary judgment on this claim.

### B. Fraud (Count II)

Two incidents form the basis of Plaintiff's fraud claim against Trunk.[1] First, Plaintiff contends Trunk "intentionally made false representations. . .regarding the need to involve FlexChem in transactions with Ebbco, even though Ebbco would have dealt" with Plaintiff directly at a lower cost. Second, Trunk caused Plaintiff to make payments to "FlexChem for unordered and/or unneeded parts and machines." (Doc. No. 27, Ex. A at ¶¶ 29, 30).

Under Michigan law, a plaintiff must show the following elements to successfully advance a fraud claim:

> (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowl    edge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage.

Unibar Maint. Servs. v. Saigh, 769 N.W.2d 911, 920 (Mich. App. 2009); Hi-Way Motor Co. v. International Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976).

Moreover, under federal pleading standards, any allegation of fraud must "state with particularity the circumstances constituting fraud or mistake." (Fed. R. Civ. P. 9(b)). To plead fraud with sufficient particularity, a plaintiff must allege "(1) 'the time, place,

---

[1]Schütte agreed to forego a third claim alleging Trunk instructed it to buy grease from FlexChem and collets from Advanced Holding Designs at an inflated cost, provided summary judgment were granted in its favor on the other claims. Moreover, Plaintiff did not present evidence sufficient to support an award of summary judgment on this basis.

8

and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury." Chesbrough v. VPA, P.C., 655 F.3d 461, 467 (6th Cir. 2011) (quoting Bledsoe v. Cmty. Health Sys. Inc., 501 F.3d 493, 504 (6th Cir. 2007)).

### 1. Sufficiency of the Allegations

According to Trunk, Schütte's Complaint fails to identify the time, place, or content of the misrepresentations, the falsity therein, and whether Plaintiff would knowingly rely on the misrepresentations. Plaintiff filed its complaint in state court, which does not require the same pleading standards set forth in Fed. R. Civ. P. 9(b). Trunk did not move to dismiss the Complaint under Rule 9(b) after it was removed.

The Court finds Schütte's fraud allegations satisfy Fed. R. Civ. P. 9(b). The nature of the misrepresentations are sufficiently clarified by the exhibits attached to Speed's affidavit, which log the date and contents of each transaction with FlexChem – all of which collectively add up to Schütte's total requested damages. (Doc. 22, Ex. A.1 at 2) (Speed Aff.). Further, Schütte's Complaint describes the alleged "scheme," claiming that Trunk "made false representations of material facts . . . regarding the need to involve FlexChem in transactions with Ebbco . . . even though Ebbco would have dealt, and had been dealing, directly with Schütte at a lower cost," and that Trunk instructed Schütte "to make payments to FlexChem for unordered and/or unneeded parts and machines." (Doc. 27 at 5, ¶¶ 29,30). The Complaint alleges that Trunk committed the fraud intentionally, (id. at 5, ¶¶ 29-31), and Exhibit 1 attached to Speed's affidavit clearly demonstrates Schütte's claimed financial injuries from the alleged fraud. (Doc. 22, Ex. A.1).

9

**2. Merits**

Schütte has demonstrated its entitlement to summary judgment on its fraud claim based on Trunk's use of FlexChem to supply Ebbco products to Plaintiff to add a gratuitous mark-up. In addition, Plaintiff alleges Trunk committed fraud when he sought payment in the amount of $75,144.06 for FlexChem for four machines that Schütte never ordered and never received.

Trunk's explanation--that the Ebbco units were never received because the $75,000 was a partial prepayment to FlexChem on an order that was later cancelled- is unsupported by the record. (Doc. 22, Ex. B at 81). According to Trunk, FlexChem never refunded the $75,000 because it had already given the money to Ebbco, who had "a policy of nonrefundable items in the event an order was cancelled." (Doc. 22, Ex. B at 82, lines 6-7).

A thorough review of the parties' evidence shows that even though Trunk's explanation for the lost $75,144.06 contradicts Schütte's, Trunk again has failed to demonstrate a genuine dispute. See Anderson, 477 U.S. at 251-52), First and foremost, Trunk has no independent evidence to support his claim that the $75,000 was lost when Schütte canceled its order from Ebbco. (Doc. 22, Ex. B at 82, lines 6-7). In contrast, Schütte's version of events is thoroughly corroborated. Schütte has provided a copy of the invoice from FlexChem to Schütte, billing Schütte $75,144.06 for four Ebbco units. (Doc. 27, Ex. C at 4). According to Speed's affidavit, these four Ebbco units were "never ordered and were never received." (Doc. 22, Ex. C at 18, line 22). Speed's testimony is corroborated by the affidavit from Jennifer Poppe, Ebbco's Accounting Manager, which states that FlexChem "did not place an order" for the four units, and

never paid Ebbco any money for the units. (Doc. 27, Ex. C at 2 ¶ 5). Schütte has also provided documentation that, shortly after receiving Schütte's $75,144.06 in his bank account, Trunk transferred $68,000 of that money into his own personal account rather than sending it to Ebbco. (Doc. 27, Ex. D at 1). Therefore, the Court grants summary judgment to Plaintiff.

Lastly, Schütte also alleges that Trunk ordered an extra filtration system from FlexChem for $27,741, which it never ordered and could not sell. (Doc. 22, Ex. B at 90-91). Schütte still has possession of the filtration system at its warehouse.

Although Trunk fails to address this issue in his response, at his deposition, Trunk claimed that he ordered the filtration system because he was also pre-ordering AG-20 machines in anticipation of repeat business from United Training Munitions ("UTM"). (Doc. 22, Ex. B at 90-91). According to Trunk, at the time he left the company, this filtration unit "was still there, still wrapped up, sitting next to a new AG-20 machine . . . ." (Id. at 91, lines 5-7). He also testified that even if UTM never bought the AG-20 machine, the filtration unit was not a waste because whoever bought the AG-20 machine would still need a filtration unit. (Id. at 92, lines 1-2). Even if no one ever bought the particular AG-20 machine, Trunk points out, the filtration unit could also fit any similar Schütte machine. (Id. at 91, lines 20-24). Because the Court finds questions of fact exist as to whether the purchase of the machine constitutes fraud or merely reflects a poor business decision, summary judgment is denied on this basis.

### C. Conversion (Counts III and IV)

The parties disagree as to whether Trunk converted Schütte's resources for his own gain by (1) overcharging Schütte $95,001.99 for Ebbco items; and/or (2) by

11

instructing Schütte to prepay FlexChem $75,144.06 for the Ebbco machines, and then keeping the pre-payment for his own use.

In Michigan, conversion has both a common-law and statutory basis. At common-law, conversion "consists of any distinct act of domain exerted over another's person property in denial of or inconsistent with the rights therein." Dep't of Agric. v. Appletree Mktg, 779 N.W.2d 237, 244 (Mich. 2010). Michigan law defines statutory conversion according to its common-law definition. Murray Hill Pubs. V. ABC Comms., Inc., 264 F.3d 622, 636 (6th Cir. 2001). There are two forms of statutory conversion:

> (a) Another person's stealing or embezzling property or converting property to the other person's own use.
>
> (b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Mich. Comp. Laws § 600.2919a(1)(a)-(b). Under Michigan law, a plaintiff may sue "for the conversion of funds that were delivered to the defendant for a specified purpose, but that the defendant diverted to his or her own use." Tooling Mfg. & Technologies Ass'n v. Tyler, No. 293987, 2010 WL 5383529, at *11 (Mich. Ct. App. Dec. 28, 2010) (citations omitted).

To be held liable for statutory conversion under Michigan law, a defendant must have known that the property at issue was stolen, embezzled, or converted. Echelon Homes, L.L.C. v. Carter Lumber Co., 694 N.W.2d 544, 549 (Mich. 2005). Although constructive evidence is permissible to show knowledge, actual knowledge (not just constructive knowledge) must be proven before liability can be imposed. (Id.). A party

damaged under either form of statutory conversion is entitled to treble damages, plus costs and reasonable attorney fees.  Mich. Comp. Laws § 600.2919a(1)).

Summary judgment on Schütte's conversion claim therefore requires the Court to find that there is no genuine dispute of fact concerning (1) that Trunk actually knew that he not entitled to possess the funds, and (2) that Trunk converted the funds to his own use by treating them in a manner inconsistent with Schütte's ownership rights.  Plaintiff has met its burden as to its claim of conversion of Schütte's $75,144.06 prepayment to FlexChem, but not for the $95,001.99 Schütte claims it overpaid FlexChem.

### 1. Conversion of $75,144.06 Prepayment

The Court already found that there is no genuine dispute of fact that Trunk fraudulently obtained a $75,114.06 prepayment from Schütte for four machines that it never ordered from Ebbco.  Schütte has provided sufficient evidence that Trunk never transferred any of the prepayment money to Ebbco,  (Doc. 27, Ex. A at 2), and kept all, or almost all, of Schütte's prepayment for himself.   (Doc. 27, Ex. D).

There is no genuine dispute because Trunk's deposition testimony does not contradict Schütte's allegations. Trunk testified that after depositing a Schütte check for $75,144.06 into the FlexChem account, he transferred $68,000 from the FlexChem account to one titled in his name.  (Doc. 22, Ex. B at 86). When asked what he did with the $68,000, Trunk stated that he "[has] no clue."  (Id. at 87, line 19).  Because Trunk accepted Schütte's money for items that he never ordered, he had actual knowledge that he was not entitled to possess the funds.  Because Trunk does not claim to have ever returned the $68,000, or any other portion of the funds from Schütte's prepayment, there is no genuine dispute concerning the fact that Trunk acted inconsistently with

13

Schütte's ownership of the funds. Summary judgment is therefore appropriate on this conversion claim. Because Trunk admits that he is interchangeable with FlexChem, (Doc. 22, Ex. B at 39, 44, FlexChem would have been equally aware as Trunk was that the money was a prepayment for machines that had never been requested and were never being ordered. Therefore, in accepting this money, FlexChem was knowingly "receiving . . . embezzled, or converted property." This brings FlexChem squarely within Mich. Comp. Laws § 600.2919a(b).

### 2. Conversion of $95,001.99

Again as the Court already has held Trunk's arguments do not create a genuine dispute of fact regarding whether he improperly overcharged Schütte for the Ebbco machines purchased for UTM. There is no question that Schütte could have purchased the items directly from Ebbco; however, Trunk stated that he was able to purchase items for a lower price. (Doc. No. 26, Ex. A at ¶ 19). Nevertheless, there is no evidence to support Trunk's claim that the mark-up was "fair" because it reflected shipping, warranty, and design costs. Therefore, summary judgment is warranted.

### D. Breach of Contract (Count V)

Approximately six years after becoming President and CEO, Trunk received an $80,000 loan from Schütte. In a letter dated August 31, 2012 (the "Letter Agreement"). (Doc. 1 at 9), the parties agreed that Trunk would repay the loan from his commission on Schütte's sales. (Id.). In the event that Trunk did not receive commission in the future, the principal on the loan would be deducted from Trunk's salary. (Id.). If Trunk's employment with Schütte ended, he was to pay the balance of the loan immediately. (Id.).

Schütte states that the current balance due on the loan is $58,016.77, which reduces to $33,306.89 after applying $24,709.86 in sales commissions the company has withheld from Trunk. (Doc. 22, Ex. A at 2). According to Trunk, the Agreement states that the loan is to be paid from unpaid commissions, yet he claims to be "owed approximately $87,000 in commissions which have not yet been paid." (Id. at 9-10). Therefore, Trunk argues, he has yet to breach the contract.

To recover for breach of contract under Michigan law, a plaintiff must prove: (1) the existence of a contract between the parties, (2) the terms of the contract, (3) that the defendant breached the contract, and (4) that the defendant's breach caused his injury. Webster v. Edward D. Jones & Co., 197 F.3d 815, 819 (6th Cir. 1999).

The Letter Agreement is unambiguous. Moreover, it provides that "[i]n case that [Trunk] leave[s] the company before having paid said loan, the full balance will be due immediately." (Doc. 1 at 9). Because the balance was due at the time he resigned, Trunk breached the Letter Agreement.

### E. Claim and Delivery (Count VI)

Next, the Court considers Schütte's claim that Trunk had its Bridgeport Mill shipped to Performance Automotive Restoration, a company Trunk used to work on one of his own automobiles. (Doc. 22 at 21). After the Mill was shipped, Schütte invoiced Trunk $1,713.70 for the Mill, which it believes is the Mill's fair value. According to Schütte, Trunk has neither paid this invoice nor has he returned the Mill. Schütte asks that this Court "order Defendant Trunk to immediately return the Mill to Schütte or enter a judgment against Defendant Trunk and in favor of Schütte for the value of the Mill." (Doc. 27, Ex. A at 9).

15

To prevail on a claim and delivery action, Plaintiffs must prove that Defendant unlawfully took or detained goods or personal property, to which Plaintiff has a right to possess. Mich. Comp. Laws § 600.2920; Mich. Court Rule § 3.105(A). Michigan law allows recovery of possession and "damages sustained by the unlawful taking . . . ." Mich. Comp. Laws § 600.2929(1)).

Trunk claimed at his deposition that he wrote a check to pay for the Mill "either out of the FlexChem account or out of [his personal] account." (Doc. No. 23 at 93). Schütte's financial books and records contain "no evidence that Trunk or FlexChem ever paid Schütte the invoice for the Mill, and the Mill has not been returned to Schütte." (Doc. 22, Ex. A at 2, ¶ 12). Trunk has not provided a cancelled check or other bank payment indicating that payment occurred.

Under Trunk's second payment theory, that Schütte deducted the cost of the Mill from reconciliation payments, there would be a notation in Schütte's company records demonstrating the transfer. Schütte has detailed records demonstrating that Trunk never paid for the Mill, and Trunk only has his unsupported conjecture.

Nevertheless, Trunk does not possess the Mill. Plaintiff failed to address this fact. Therefore, the Court cannot grants summary judgment on this claim.

**F. Counterclaim for Commissions and Bonuses**

Trunk claims that Schütte breached his employment contract by failing to fully compensate him. There is no dispute that Schütte withheld $24,709.86 in outstanding commissions. According to Trunk, he is entitled to $89,000 in unpaid commissions.

To recover for breach of contract under Michigan law, a plaintiff must prove: (1) the existence of a contract between the parties, (2) the terms of the contract, (3) that the

16

defendant breached the contract, and (4) that the defendant's breach caused his injury. Webster, 197 F.3d at 819.

At the time of his resignation, Trunk's compensation package included $120,000 per year, 1% of all of Schütte's new machine sales and 1.5% of all used machine sales. (Doc. 26, Ex. C at 16-18). Trunk claims he never received his complete commission for the sales of a Zimmer Grinding Machines ($32,000 owed); a Tylok Multi-Spindle Machines A-36PC ($12,000 owed); an Auto Cam AG-20 ($8,000 owed); a Continental SC-9 ($25,000 owed); and a Milwaukee Electric ($12,000 owed). (Id.).

Other than his own affidavit, Trunk has provided no evidence of these outstanding debts. (Doc. 22 at 21-22). Trunk has provided no testimony as to when these items were sold; who purchased these machines, and never claimed that he was owed any additional commissions until Plaintiff filed suit in July 2014. (Id. at 22). Nevertheless, Trunk has not moved for summary judgment, Schütte has. Although it argues that the commissions requested by Trunk are for sales outside North America, or outside the six-year statue of limitations on contract claims, or already paid, or withheld in order to apply them against the remaining balance of Trunk's $80,000 loan, as per the terms of the Letter Agreement, (Doc. 22 at 22), Plaintiff has not directed the Court to evidence demonstrating its version of facts cannot be challenged. Accordingly, Plaintiff has not met its burden, and summary judgment must be denied.

### G. Michigan Sales Representative Commissions Act

Trunk further claims that he is owed outstanding commissions in violation of the Michigan Sales Representative Commissions Act ("the Act") Mich. Comp. Laws Ann. § 600.2961(1)(d)(i)-(ii) (West 2015) (Doc. No. 16). The Act's purpose is to ensure that

17

Michigan employers pay sales agents the commissions they are entitled to, especially after terminating their employment. Howting-Robinson Assocs., Inc. v. Bryan Custom Plastics, 65 F. Supp. 2d 610, 613 (E.D. Mich. 1999) (citing Walters v. Bloomfield Hills Furniture, 577 N.W.2d 206 (Mich. App. 1998)).

Trunk stated that as President and CEO, he took responsibility for all of Schütte's business, financial, and administrative duties. (Doc. 22, Ex. B at 17). Trunk testified that he had a "heavy sales role" while President and CEO. (Doc. 26, Ex. A at 2, ¶ 7) (Trunk Aff.). Trunk claims he worked as both CEO and a Commission Sales Agent. (Counterclaim at ¶ 1). There is no dispute that he was involved in sales.

Nevertheless, the Court finds that Trunk is not entitled to compensation as a "sales representative" because he was employed as Schütte's President and CEO, and the Act does not apply. Trunk had a different commission structure than a Schütte salesperson. (Id.). He received 1% of the net sales of certain machinery and equipment sold through the company, including sales made by sales representative for the company. This structure was designed to encourage Trunk to increase overall company growth. His involvement with Schütte's main customers to "do the sales," in no way transformed Trunk into a "sales representative." These meetings were simply yet another part of Trunk's multifaceted responsibilities as CEO.

### IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS** summary judgment on Counts I (Breach of Fiduciary Duty), III (Conversion against Trunk), and IV (Conversion Against FlexChem Corporation), V (Breach of Contract), and partial summary judgment on Count II (Fraud). Finally, the Court **DENIES summary judgment on** Count VI

(Claims and Delivery) and Trunk's counterclaim regarding the unpaid commissions.

Finally, the Court **DISMISSES** Trunk's Counterclaim regarding the Michigan Sales Representatives Commission Act.

**IT IS SO ORDERED.**

Date:   March 30, 2016                                     s/Marianne O. Battani
                                                          MARIANNE O. BATTANI
                                                          United States District Judge


CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on March 30, 2016.

                                                          s/ Kay Doaks
                                                          Case Manager